Phillip C. MOZER et al., d/b/a Mozer Brothers, Appellants,

v.

G. W. GOOLSBEE and G. D. Barrett, Jr., d/b/a Goolsbee & Barrett, Appellees.

No. 3370.

Court of Civil Appeals of Texas.

Waco.

June 7, 1956.

After Entry of Remittitur July 2, 1956.

Rehearing Denied July 19, 1956.

Walstein Smith, Jr., McGregor & McGregor, Waco, for appellants.

W. C. Haley, Hubert Dunham, Waco, for appellees.

TIREY, Justice.

Appellants grounded their cause of action on conversion of 37 drums of poison which they alleged to be of the value of $5073.25 at the date they consigned the merchandise to appellees. Appellees denied the allegations against them and filed cross-action and cross-complaint against the appellants, and pertinent to this discussion averred that the 37 drums of poison sued for was an overshipment that appellants made to them, and that the merchandise was not wanted and that it was useless

for the purpose for which it was made; that they sold some of the merchandise to customers and that they were required to make refunds because the material was worthless and ineffective and did not do the job that it was intended to perform. They alleged in their cross-action that they had been damaged in the sum of $5671.25, and in their trial amendment they alleged that they had been damaged in the sum of $13,975, and they prayed for this sum and general relief.

The cause was tried without the aid of a jury and the court found in favor of appellees and against appellants and in the judgment we find this recital:

"The court * * * is of the opinion and finds that the plaintiffs and cross-defendants are not entitled to recover money judgment against the defendants and cross-plaintiffs, but that 37–50 gallon drums of 1–2 Cotton Mix presently situated in the warehouse of the defendants, Goolsbee and Barrett, in Waco, Texas, belong to plaintiffs and title thereto is hereby declared to be in (plaintiffs, naming them) * * * and the Court is of the opinion and finds that an agreement was reached by and between (plaintiffs, naming them) upon the one hand and G. W. Goolsbee and G. D. Barrett, Jr., a partnership composed of Goolsbee and Barrett upon the other hand, in the early summer of 1954 by the terms of which the co-partnership * * * would deliver to G. W. Goolsbee and G. D. Barrett, Jr. * * * 2850 gallons of toxaphene for 2850 gallons of 1–2 Cotton Mix and Aldrin at that time owned and held by Goolsbee and Barrett; that the co-partnership of Mozer Bros. breached their contract to so deliver said toxaphene in exchange for said 1–2 Mix and Aldrin; that the reasonable cash market value of said toxaphene at said time was $3.50 per gallon, and that the reasonable cash market value of said 1–2 Mix and Aldrin, at said time, was $2850.00 and that the defendants and cross-plaintiffs, G. W. Goolsbee and G. D. Barrett, Jr., have sustained damages as a direct result of said breach in the sum of $7125.00."

The court further decreed:

"(1) That title to 37–30 gallon drums of 1–2 Cotton Mix presently situated in the warehouse of Goolsbee and Barrett in Waco, Texas, is hereby declared to be in Phillip C. Mozer, Sam C. Mozer, Lena Mozer and Rose Mozer, d/b/a Mozer Brothers;

"(2) That G. W. Goolsbee and G. D. Barrett, Jr., d/b/a Goolsbee and Barrett, a co-partnership, do have and recover of and from * * * the co-partnership called Mozer Brothers, composed of Phillip C. Mozer, Sam C. Mozer, Lena Mozer and Rose Mozer, jointly and severally, the sum of $7125.00, with interest thereon at the rate of 6% per annum from date of judgment until paid."

Appellants seasonably filed their motion for new trial, which was overruled, and thereafter seasonably filed written request to the court to make and file findings of fact and conclusions of law. We quote the pertinent parts of the findings of fact and conclusions of law:

"Findings of Fact

"1. That prior to April 28, 1951 Goolsbee and Barrett ordered certain cotton spray from Chemical Corporation of Colorado; that in response to such order, Chemical Corporation of Colorado shipped 37 drums of 30 gallons 1–2 cotton spray to Goolsbee and Barrett in addition to the amount ordered.

"2. On December 29, 1951, Chemical Corporation of Colorado credited the account of Goolsbee and Barrett with $5073.25 for the 37 drums of 30 gallons 1–2 cotton spray which was overshipped.

"3. That at the time of trial Goolsbee and Barrett still held in their warehouse in Waco, Texas said 37 drums of 30 gallons 1–2 cotton spray which had been an overshipment, as the property of Chemical Corporation of Colorado, or its assigns.

"4. That there was no conversion of said 37 drums of 30 gallons 1–2 cotton spray by Goolsbee and Barrett.

"5. On December 3, 1953 the Chemical Corporation of Colorado was adjudicated a bankrupt; the 37 drums of 30 gallons each of 1–2 cotton spray, which had been an overshipment, was assigned to Mozer Brothers, Denver, Colorado.

"6. That in the early part of 1954 Goolsbee and Barrett had in their warehouse in Waco, Texas, the following merchandise:

10–55 gallon barrels of 1–2 cotton mix poison
55–30 gallon barrels of 1–2 cotton mix poison
2–55 gallon barrels of Aldrin
18–30 gallon barrels of Aldrin

"That the above listed poison was in addition to the 37 drums of 30 gallons 1–2 cotton spray held in the warehouse of Goolsbee and Barrett which had been an overshipment in 1951.

"7. That all of said merchandise above listed had been purchased from the Chemical Corporation of Colorado.

"8. That all of the merchandise above listed was defective when shipped by the Chemical Corporation of Colorado.

"9. That in the early part of 1954 Phillip C. Mozer representing himself, Sam C. Mozer, Lena Mozer, and Rose Mozer, mutually agreed with G. W. Goolsbee and G. D. Barrett, Jr., d/b/a Goolsbee and Barrett of Waco, Texas, to exchange gallon for gallon the above listed 10–55 gallon barrels of 1–2 cotton mix poison; 55–30 gallon barrels of 1–2 cotton mix poison; 2–55 gallon barrels of Aldrin; and 18–30 gallon barrels of Aldrin, for an equivalent number of gallons of Toxaphene.

"10. That Phillip C. Mozer, Sam C. Mozer, Lena Mozer, and Rose Mozer, d/b/a Mozer Brothers, breached their contract to exchange the above described merchandise for Toxaphene.

"11. That the reasonable cash market value of said Toxaphene at said time was $3.50 per gallon and that the reasonable cash market value of said 1–2 cotton mix and Aldrin at said time was $1.00 per gallon.

"12. That after the above described exchange agreement had been made, plaintiffs and cross-defendants by various correspondence attempted to negotiate a modification of the above described agreement but no contract or agreement was reached modifying the agreement made between the parties, described in Finding of Fact No. 9.

"Conclusions of Law

"1. The 37 drums of 30 gallons 1–2 cotton spray which had originally been an overshipment was, at the time of trial, the property of Mozer Brothers, plaintiffs and cross-defendants herein.

"2. That by reasons of the breach of the exchange agreement made between the parties in the early part of 1954 by Phillip C. Mozer et al, plaintiffs and cross-defendants, G. W. Goolsbee and G. D. Barrett, Jr., d/b/a Goolsbee and Barrett, defendants and cross-plaintiffs, is entitled to recover damages from Phillip C. Mozer, Sam C. Mozer, Lena Mozer and Rose Mozer, d/b/a Mozer Brothers, in the sum of $7125.00."

Appellants seasonably filed exceptions to the findings of fact and asked for addition-

al findings of fact. This request the court overruled.

The judgment is assailed on what appellants designate as five points. They are:

"1. This case should be reversed because the Court refused to hold that there was conversion, notwithstanding the inconsistent fact that it held that title to subject cotton poison belonged to appellants, who were denied possession of such poison by appellees.

"2. This case should be reversed because the Court held that a contract was entered into between Appellants and Appellees in 1955 to make an exchange of good poison for defective poison sold by a corporation, later dissolved by bankruptcy to the Appellees in 1951, almost four years prior to Appellees' cross action; thus holding that such a contract would not be barred by Statute of Frauds under RCS Art. 3995, which requires such a contract to be in writing and signed by the person sought to be bound.

"3. This case should be reversed because the Court held that certain negotiations between Appellants and Appellees developed ino a valid and enforceable contract when no proof or evidence was submitted that all the necessary elements of a valid contract were present.

"4. This case should be reversed because the measure of damages and the method of assessing damages were improper and inconsistent with the law and evidence, and damages are excessive.

"5. This case should be reversed because the Court was guilty of misconduct in the trial in exhibiting bias and hostility against Appellants."

■ Since this cause was tried without the aid of a jury, we must approach our consideration of appellants' points in the light of certain well established rules. First of all, judgment by the trial court will not be set aside if there is any evidence of a probative nature to support it, and a Court of Civil Appeals cannot substitute its findings of fact for those of the trial court if there is any evidence in the record to sustain the trial court's findings. See Cavanaugh v. Davis, 149 Tex. 573, 235 S.W.2d 972; Woodward v. Ortiz, 150 Tex. 75, 237 S.W.2d 286. See also cases collated under 4 Tex.Dig., Appeal and Error, ⬅ 1010(1).

■ Under the foregoing rules, we think there is sufficient evidence in the record to sustain the trial court's finding of fact that appellees were not guilty of conversion and appellants' first point is overruled. We are of the further view that recitals of the testimony tendered on this phase of the case would be without precedential value.

■ Appellees went to trial on their answer and cross-action, which was in answer to the appellants' Second Amended Original Petition, which was filed on October 26, 1955. Thereafter, on November 2, 1955, the court permitted appellees to file their trial amendment, and in this trial amendment we find that appellees alleged that plaintiffs "were principal officers and stockholders in the Chemical Corporation of Colorado and that when the Chemical Corporation of Colorado was declared bankrupt that the plaintiffs and cross-defendants herein began the operation of a chemical company in Colorado, a corporation by the name of Export Chemical Corporation of Colorado and also began operations of chemical manufacturing and distribution company by the named plaintiffs and cross-defendants herein doing business as Mozer Brothers and that subsequent to the formation of the above mentioned corporation and subsequent to the beginning of operations by Mozer Brothers, Phillip C. Mozer, individually and as a partner in the partnership of Mozer Brothers, entered into an agreement with G. W. Goolsbee and G. D. Barrett, Jr., that Mozer Brothers

would exchange an equivalent amount of toxaphene for all of the 1–2 cotton mix spray (Aldrin-DDT) and all of the Aldrin which the defendants had paid for, and was presently on hand in the warehouse of Goolsbee and Barrett, said exchange to be made upon the then market value of all of said products and that upon receipt of said toxaphene by Goolsbee and Barrett, all of the 1–2 cotton mix spray (Aldrin-DDT) and all of the Aldrin on hand with Goolsbee and Barrett would be shipped to Chemical Corporation of Colorado; that at the time of said agreement Goolsbee and Barrett had 10–55 gallon drums of 1–2 cotton mix spray, 55–30 gallon drums of 1–2 cotton mix, 2–55 gallon drums of Aldrin, and 18–30 gallon drums of Aldrin and that the current market price of said products was $13,975.00; that the plaintiffs and cross-defendants wholly breached their contract to exchange said defective merchandise for toxaphene and failed and refused to exchange said materials as they had agreed to do, all to the damage of the defendants and cross-plaintiffs in the sum of $13,975.-00.''

Going back to the court's findings 9, 10 and 11, we find that the effect of these three findings is that appellees had in their possession 2850 gallons of what they refer to as cotton mix poison, and that the market value of this cotton mix poison was $1.00 per gallon; that appellants had agreed to exchange an equivalent number of gallons of toxaphene for appellees' cotton mix poison, and that the market value of toxaphene at that time was $3.50 per gallon, and that the difference in values, based on the market price above, amounted to $7125. So the question arises: Did the appellees carry their burden and show by testimony of probative value that there was a meeting of the minds between appellants and appellees, whereby they agreed to make such exchange of the above property.

We have examined very carefully the correspondence between the parties beginning April 12, 1954 and ending with a letter dated July 16, 1954, written by the Export Chemical Corporation to Mr. Dunham, attorney for appellees, which letter substantially is as follows:

"Regarding your letter of July 2nd, I regret that we cannot accept your proposal at this time. However, I plan to be in Waco within the next week or ten days and I will set aside a day to try to work this out to everyone's satisfaction."

It is obvious that under the foregoing correspondence, this record is without dispute that there was no meeting of the minds of the parties as to an exchange of this poison up to and including July 16, 1954. But appellees in their brief say the following testimony amply supports the trial court's finding that an independent agreement of exchange supported by sufficient consideration was reached; and appellees quote at length from the testimony of Mr. Mozer, Mr. Barrett and Mr. Goolsbee. We have examined this testimony very carefully and we are in accord with this view. We quote the pertinent parts of Mr. Mozer's testimony:

"Q. Mr. Mozer, during the time that you were here in the spring and early summer of 1954 you did have some discussion with Goolsbee and Barrett about exchanging all of the 1–2 mix and all of the Aldrin they had on hand for Toxaphene, did you not? A. No sir. * * *

"Q. You did have some discussion with Mr. Goolsbee and Mr. Barrett about exchanging the amount of Aldrin they had down there for Toxaphene, did you not? A. In the amount of equivalent gallonage to the thirty-seven 30 gallon drums, but not all. * * *

"Q. In other words, whatever Aldrin they had on hand down there you were going to exchange one gallon of Toxaphene for each gallon of Aldrin

they had down there. A. Up to the amount of 37–30 gallons, which would be 1130 gallons.

"Q. I am asking you now if you didn't have some discussion with them about this? A. Yes.

"Q. You also had some discussion about exchanging this defective 1–2 mix for Toxaphene, did you not? A. I don't believe it shows the 1–2 mix in there. * * *

"Q. Well, you talked with Mr. Goolsbee and Mr. Barrett when you were down here each time, did you not? A. Mr. Goolsbee and Mr. Barrett always.

"Q. Well, you did talk with them? A. Yes, I talked with them, but not in regards to anything specifically.

"Q. Now, you never did, even up to today, you have never exchanged any Toxaphene for either Aldrin or 1–2 mix with Goolsbee and Barrett, have you? A. There never was a meeting of minds to justify such an exchange."

Mr. Mozer further testified in part:

"Q. At the time you ceased negotiations trying to effect an amicable settlement with the Goolsbee & Barrett firm, were you familiar with the market value of 1–2 cotton spray? A. Yes, sir.

"Q. What was the reasonable market value?

"(Mr. Haley: What time are you talking about now? Mr. McGregor: July of 1954) A. I would say that the value was approximately $4.50 per gallon. * * *

"Q. Have you ever had an opportunity to sell these 37 drums of stuff after being reworked? A. Yes, we have.

"Q. Who did you have an opportunity to sell it to? A. Well, we had several opportunities, but specifically, Sam McGuilford Fertilizer Company.

"Q. What was the offer that the Fertilizer Company made? What could you sell it for? A. $4.50 C. I. F. Puerto Rico. * * *

"Q. Now approximately what would it cost to rework this stuff? A. Approximately $1.00 a gallon.

"Q. And that would have been a dollar a gallon even in 1954? A. It would be a dollar a gallon at any time."

Mr. G. D. Barrett, Jr., testified in part:

"Q. Did you personally have any conversation with Mr. Mozer in the spring and summer of 1954 regarding this Aldrin and 1–2 cotton spray that you have in your warehouse, then, and also at the present time? A. I did.

"Q. Did your firm and Mr. Mozer reach any nature of agreement as to what was to be done with that merchandise down in your warehouse at the present time? A. He was going to pick it up and swap it gallon for gallon, for Toxaphene.

"Q. And did he ever do that? A. No, he never has.

"Q. There was, after he reached that agreement with you, there was later some effort to change the agreement or work out something else and you all never would agree to that, I believe, is that correct? A. That's correct.

"Q. He was going to pick up all the poison you had? A. Yes, which was about half the price of the material that we have now.

"Q. You mean Toxaphene was about half the price? A. Yeah, about

half the price of the material we have now."

Mr. Goolsbee testified:

"Q. Now, Mr. Goolsbee, in the summer of 1954, that is, the summer of last year, after the bankruptcy, Mr. Phillip Mozer came down and talked with you and Mr. Barrett? A. Yes, sir.

"Q. Did you reach any sort of an agreement with Mr. Mozer about exchanging this Aldrin and 1–2 cotton mix for Toxaphene? A. Mr. Haley, at the time I had had a pretty bad accident I had the side of my skull here removed and I lost my right eye. The proposition, he and Mr. Reed came in and they stayed all night and then they came down the next morning, and the first proposition was, they wanted to allow me dollar for dollar for all of the bad stuff I had there you know, and they had formed a new company you see, and offered to pay me dollar for dollar in stock in the new company for what I had purchased, which would run somewheres around between 11, 12 or 15 thousand dollars, and I told them I didn't want any of the stock.

"Q. You didn't want any of that stock? A. No, I didn't.

"Q. So did you subsequently reach an agreement with them to try to exchange the stuff you had down there? A. I told them to go down and talk to Mr. Barrett and talk to Mr. Dunham, and he went back home and came again. He came and talked to me and I told him to go down to Mr. Dunham and Mr. Barrett and talk with them and whatever they agreed to would be alright with me. When he started to leave that evening, I was sitting at my desk, and he come by and told me that they had made a trade, that they would go ahead and give me the stuff like they said.

"Q. Now, what do you mean, give you Toxaphene for this other? A. Yes, and all of the Aldrin and 1–2 Mix.

"Q. He said they had made a trade and had agreed to do that. A. Yes.

"Q. That was Mr. Phillip Mozer here? A. Yes.

"Q. And he told you that personally. A. Yes.

"Q. He was to give you gallon for gallon of Toxaphene for all the Aldrin and 1–2 mix you had down there. A. Yes, sir, all that was listed as bad. He said he would let me know later, or write Mr. Dunham, I believe he said he would write Mr. Dunham, my lawyer, in regards to the exchange later on.

"Q. Was there any agreement at that time? A. Yes.

"Q. Now, Mr. Goolsbee, have they ever exchanged any of this stuff you have got down there? A. No, sir."

Appellee Goolsbee further testified in part:

"Q. Now, after this agreement was made, Mr. Goolsbee, between your firm and Mr. Phillip Mozer here, that was in the summer of 1954, was it? A. I believe so.

"Q. After that agreement was made did Mr. Mozer later write down and want some different conditions about shipping and one thing and another? A. He never did. I didn't correspond with Mr. Mozer any more. I never saw Mr. Mozer after that until this morning, after he came by the office and told me what he did. Mr. Dunham called me several times when he would have a letter from Mr. Mozer.

"Q. He was backing out on that agreement at that time? A. He wrote Mr. Dunham in regards, I believe Hu-

bert called me, he wanted to pick up all the Aldrin I had which I had paid $6.20 a gallon for it, and his 37 30 gallon drums of the 1–2 mix, and attend to the other later you see, but our understanding was it was all to be exchanged at one time.

"Q. That was your agreement that you had with him? A. That's right.
* * *

"Q. Now, in so far as this 1–2 cotton mix was concerned, as far as you were concerned you didn't want that stuff reworked or anything of that nature immediately after it was shipped, did you? A. Well, when I found out it was bad, immediately after I found out it was bad, they came down and reported it.

"Q. Well, as far as you were concerned you didn't want that reworked at all, you wanted something else different. A. I was willing to take anything in adjustment, but that was my suggestion I would sacrifice the $6.20 a gallon that I paid for Aldrin for $2.54 Toxaphene, even up swap back, and then I give $4.05 or $4.15, I believe it was $4.05 a gallon for the 1–2 mix, and I would also swap it gallon for gallon for Toxaphene which I was paying $2.54 in 30 gallon drums and $2.41 in 55 gallon drums.

"Q. What date was this? A. That was along I believe last July or something like that. I couldn't tell you the exact date, but it was along last summer."

It is true· that Mr. Mozer testified in part:

"Q. * * * what was the reasonable market value, the reasonable cash market value of Toxaphene in this area would you say? A. Toxaphene in this area I suppose sold some places in the neighborhood of $3.50 a gallon perhaps.

"Q. About $3.50 a gallon? A. Yes, I would say so. It's difficult to pinpoint the market price of agricultural chemicals because that price fluctuates by supply and demand in the same manner as the market on wheat would be."

 However, since Mr. Goolsbee testified to the effect that he was able to buy Toxaphene at a price of $2.41 in 55 gallon drums, we think that their damages for the breach of the contract would be governed by the price that he would have to pay to make himself whole. So, going back to the court's finding No. 6, we find that appellees had on hand a total of 2850 gallons of defective spray which, under Mr. Mozer's testimony, was worth $1.00 per gallon, and calculating appellees' damages on Toxaphene at a price of $2.41 per gallon, the 2850 gallons of Toxaphene would amount to $6868.50. Now crediting that with the sum of $2850, which is the price placed on the cotton mix held by appellees at the time, leaves $4018.50. Therefore, this court being of the opinion that under the record here made the finding of the trial court as to the damages sustained by appellees by reason of the breach is excessive in the sum of $3106.50, and that the judgment entered thereon is excessive in the same amount and that said cause should be reversed for that reason only, it is our duty under Rule 440, Texas Rules of Civil Procedure, to call the matter to the attention of attorneys for appellees and specify within what time they may file remittitur of such excess. Accordingly, appellees are given ten days from this date in which to file remittitur of $3106.50, of the damages awarded to them for breach of the contract; otherwise, the judgment will be reversed and the cause remanded on appellees' cross-action. If such remittitur is filed within the time indicated, the judgment of the trial court will be reformed and affirmed as herein indicated on appellees' cross-action, and the judgment in all other respects affirmed.

**After Entry of Remittitur**

Appellees have entered the remittitur of $3106.50 of the damages awarded to them in the trial court as required by a former order of this court. The judgment of the trial court is reformed in conformity with said remittitur and, as reformed, is affirmed. All costs of appeal to the date of remittitur are assessed against appellees.